UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| ROBIN A. STOKES, | ) | |
| (Social Security No. XXX-XX-4500), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:07-cv-22-RLY-WGH |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM DECISION AND ORDER**

**I. Statement of the Case**

Plaintiff, Robin L. Stokes, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") or Social Security Income ("SSI") under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d), 1381; 20 C.F.R. § 404.1520(f). The court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff applied for DIB and SSI on June 14, 2004, alleging disability since March 30, 2004. (R. 62-64, 413-15). The agency denied Plaintiff's application both initially and on reconsideration. (R. 37-41, 43-45, 416-22). Plaintiff appeared and testified at a hearing before Administrative Law Judge M. Kathleen Gavin ("ALJ") on June 7, 2006. (R. 427-53). Plaintiff was represented by an attorney; also testifying was a vocational

expert. (R. 427). On September 8, 2006, the ALJ issued her opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform her past work. (R. 15-21). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 5-7). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on February 22, 2007, seeking judicial review of the ALJ's decision.

## II. Statement of the Facts

### A. Vocational Profile

Plaintiff was 39 years old at the time of the ALJ's decision and had a ninth-grade education. (R. 431-32). Her past relevant work experience was that of a restaurant manager, a dry cleaning presser, and a counter worker; each of these jobs were light skilled jobs. (R. 20).

### B. Medical Evidence

#### 1. Plaintiff's Physical Impairments

Plaintiff alleges she was involved in a three-wheeler accident in 1998. An X-ray dated December 3, 1998, revealed a displaced fracture through the extreme distal aspect of the left clavicle. (R. 222). On September 9, 1999, Rebecca Mosbey, PTA, indicated that Plaintiff had skipped seven out of 13 physical therapy sessions. (R. 209).

Bryan A. Bloss, M.D., saw Plaintiff on April 2, 2004. (R. 275-77). Plaintiff's cervical motion was significantly reduced, but there were no reflex deficits in the upper

extremities. (R. 275). Examination of Plaintiff's cervical spine showed lower cervical pain. (R. 275). Examination of Plaintiff's wrists demonstrated some pain as well. (R. 275). An MRI of the cervical spine and both wrists showed normal results. (R. 275, 292). Plaintiff was diagnosed with carpel tunnel syndrome and cervicalgia. (R. 276).

On April 20, 2004, Plaintiff's cervical motion was very close to normal. (R. 258). The doctor's note indicated that Plaintiff's listed medications were vitamins and aspirin as needed. (R. 258).

Michelle Galen, M.D., examined Plaintiff on August 7, 2004. (R. 293-94). Plaintiff reported quitting drinking two years prior, denied drug use, and smoked two packs of cigarettes a day. (R. 293). Dr. Galen noted that Plaintiff reported difficulty picking up coins, rotating doorknobs with both hands, and difficulty buttoning/unbuttoning clothing with her right hand. (R. 294). Cervical motion was reduced, muscle strength in the extremities was normal, but grip strength was reduced, and reflexes in Plaintiff's upper extremities were unrestricted. (R. 294). Dr. Galen's impression was that Plaintiff would benefit from physical therapy, and that her headaches would improve with treatment of her neck. (R. 294).

Carrie Krizan, P.T., performed a physical exam on December 8, 2004, which revealed limited active range-of-motion in bilateral shoulders with flexion limited to approximately 120 degrees and internal rotation limited to neutral. (R. 317-18). Active neck rotation was limited in rotation and lateral flexion to approximately 45 degrees bilaterally, and flexion and extension was limited to approximately 20 degrees. (R. 317).

Upon manual muscle testing, Plaintiff's strength was limited to 3+/5 for all muscle groups due to complaints of pain when resistance was applied. (R. 317).

Plaintiff was seen at Impact Christian Health Center on February 18, 2005. (R. 367). Plaintiff was cooperative and pleasant, and she stated that Methadone was helping her with pain and that she managed daily life quite well. (R. 367). Plaintiff was alert and oriented, her mood was much improved, and her affect was mildly flat. (R. 367). Reflexes in her upper extremities were hypoactive. (R. 367).

On February 9, 2005, Anne L. Byrne, P.T., indicated that Plaintiff made six of nine physical therapy sessions in January/February 2005. (R. 311-13). Plaintiff's prognosis was fair. (R. 311). Plaintiff suffered from polyneurapathy and neck pain. (R. 311). On March 9, 2005, Ms. Byrne indicated that Plaintiff made only four of eight physical therapy sessions in February/March 2005; Plaintiff's prognosis was fair. (R. 308-10). On April 6, 2005, Ms. Byrne indicated that Plaintiff missed seven physical therapy sessions in March/April 2005, and Plaintiff only made two sessions. (R. 305-07).

Donna Lorenzo-Bueltel, M.D., examined Plaintiff on August 11, 2005. (R. 392-94). Plaintiff was alert and oriented, and her speech was fluent. (R. 393). Plaintiff complained of numbness and tingling in her extremities and weakness. (R. 392). Muscles that flex the vertebral column and rotate the head and shoulder muscles were normal. (R. 393). There were no sensory or reflex deficits. (R. 393). Dr. Lorenzo-Bueltel opined that Plaintiff's headaches were secondary to occipital neuralgia. (R. 393). Dr. Lorenzo-Bueltel noted that a June 23, 2005 MRI of the cervical spine

4

showed some hypertrophy (enlargement), neural foraminal stenosis (narrowing) at C3, C4, and C5, and some mild central canal stenosis. (R. 393). On August 29, 2005, Dr. Lorenzo-Bueltel noted that an Electromyographic (EMG) and nerve conduction studies of the upper extremities, which Dr. Lorenzo-Bueltel had recommended, were completely normal. (R. 383).

W. Michael Roberts, M.D., examined Plaintiff on January 5, 2006. (R. 407-08). There was weakness in the upper extremities, but Dr. Roberts thought such findings may be effort dependent. (R. 408). Reflexes were reduced, and although Plaintiff complained of numbness in her left fingers, that complaint could not be documented. (R. 408). Neck flexion and extension were very reduced, but bilateral rotation was normal. (R. 408). Dr. Roberts' impression was bilateral greater and lesser occipital neuralgia and cervical facet disease at C3-4, C4-5, and C5-6. (R. 408). Dr. Roberts indicated on May 25, 2006, that Plaintiff had underwent three rounds of cervical epidural steroid injections and that "they have provided a tremendous amount of relief . . . ." (R. 403-06).

The record also contains a transcription of questions that Plaintiff's attorney asked Dr. Neeley on August 3, 2006, and her responses to those questions. (R. 410). Dr. Neeley stated that Plaintiff had limitations of fine repetitive motor movements and would have difficulty doing simple repetitive movements using her hands. (R. 410). Plaintiff's drug use exacerbated her mental problems, and she had severe physical and mental problems. (R. 410). Dr. Neeley opined that taking into account Plaintiff's pain, medication side effects, and psychiatric problems, and eliminating any problems caused

5

by drug abuse, Plaintiff could not do simple repetitive tasks. (R. 410-11).

### 2. Plaintiff's Mental Impairment

On March 29, 2004, Plaintiff visited Matthew Lee, M.D. (R. 238). Plaintiff indicated that her job was too stressful, that she was not taking any medications, and that she used to take numerous medications including Xanax and Paxil. (R. 238).

A social worker, Cynthia Brizius, MSW, evaluated Plaintiff on May 18, 2004. (R. 346-48). Plaintiff's attitude, appearance, and behavior were each listed as "not a problem," while her affect and mood were sad, depressed, nervous, and anxious. (R. 348). Plaintiff denied suicidal and homicidal ideations, she had a slight problem with limited insight and judgment, she had no memory problems, and she was oriented. (R. 348). Plaintiff had attempted suicide in the past at least twice. (R. 346). Ms. Brizius noted that "it was clear that [Plaintiff] does have an alcohol problem and shows very little insight into how her alcohol use effects [sic] her depression." (R. 346-47). Ms. Brizius assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 50. (R. 347).

Southwestern Indiana Mental Health Center responded to a questionnaire on July 27, 2004, indicating that Plaintiff had been seen at that facility between May 18 and July 13, 2004. (R. 337-44). Plaintiff had a guarded behavior, her mood and affect were depressed, her speech was not spontaneous, and her thought processes were normal. (R. 338). Plaintiff was oriented and her memory was intact. (R. 339-40). It was reported that Plaintiff was unable to keep jobs because of anger outbursts and an inability to regulate her emotions; this also affected her ability to maintain friendships. (R. 339).

Furthermore, the report indicated that Plaintiff "has had this pattern since young adulthood. Often what will happen is the symptoms will decrease with therapy, and so the patient will often get out of treatment and the symptoms will slowly come back because there was not an internalization of the coping skills that was learned." (R. 339). It was concluded that "[w]ith treatment, utilizing dialectical behavior therapy can help to manage symptoms and learn emotion regulation skills, mindfulness skills, interpersonal skills, and ways to tolerate stress." (R. 339). Plaintiff's prognosis was guarded due to chaotic family influences and her physical health. (R. 342).

State agency psychologist W. Shipley, Ph.D., reviewed Plaintiff's medical record, and on September 9, 2004, assessed Plaintiff's mental condition. (R. 166-80). Dr. Shipley found that Plaintiff had a personality disorder that was not severe. (R. 166, 173). Plaintiff had mild restrictions in activities of daily living and social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (R. 176). Plaintiff had no episodes of decompensation. (R. 176).

A questionnaire concerning Plaintiff's condition was again responded to by Southwestern Indiana Mental Health Center after last seeing Plaintiff on October 15, 2004. (R. 326-34). Plaintiff had a GAF score of 50. (R. 326). She was cooperative, her mood and affect were melancholy and dysphoric, and her speech was relevant. (R. 327). Plaintiff was alert, her thought processes were logical, and she was oriented and in contact with reality. (R. 327-28). Plaintiff's memory was intact. (R. 329-30). The physician provided a poor prognosis for improvement, and he found Plaintiff had poor

insight.  (R. 331).

Plaintiff visited Thomas F. Liffick, M.D., on July 6, 2005.  (R. 325).  Dr. Liffick observed that Plaintiff appeared moderately depressed, and had fair insight and bad judgment.  (R. 325).  Dr. Liffick's impression was dysthymic disorder and probable borderline personality disorder.  (R. 325).

The record reveals that from September 2005 to February 2006, Plaintiff failed to keep many mental therapy appointments.  (R. 396-99).  On October 21, 2005, Plaintiff tested positive for marijuana.  (R. 360-62).  On January 31, 2006, Plaintiff was accused of marijuana abuse after a positive drug screen.  (R. 357-58).  On April 4, 2006, Plaintiff was accused of drug-seeking behavior.  (R. 354-55).

On March 13, 2006, Cynthia Brizius, MSW, reported that she had seen Plaintiff from May 2004 to January 2006.  (R. 396).  Plaintiff had presented at Southwestern Indiana Mental Health Center due to stress.  (R. 396).  Ms. Brizius noted that Plaintiff "did not follow through with therapy.  She was somewhat regular until she received her disability and then no longer scheduled any appointments in regards to therapy."  (R. 396).  Ms. Brizius indicated that Plaintiff called seeking Xanax, and Ms. Brizius posited whether or not Plaintiff was engaging in drug-seeking behavior; it was recommended that Plaintiff's treatment be terminated.  (R. 396).

On April 27, 2006, Plaintiff admitted to testing positive for Xanax, said she got it from a friend, and suggested that her positive drug screen for marijuana was based on second-hand smoke.  (R. 395).  However, Plaintiff refused to take a drug test despite it

8

being six months since her first positive marijuana screen. (R. 395). Plaintiff also suggested that she could not attend group therapy because of her physical impairments. (R. 395).

### III. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV. Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that he suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically

9

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V. The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through the date of the decision, and Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (R. 17). The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had three severe impairments: degenerative disc disease of the cervical spine; bilateral occipital neuralgia; and substance abuse, as well as non-severe mental impairments. (R. 17-18). The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix

1. (R. 18). Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible. (R. 19). Consequently, the ALJ concluded that Plaintiff retained the RFC for a full range of light work except for no repetitive overhead reaching. (R. 19). The ALJ, therefore, opined that Plaintiff retained the RFC to perform her past work. (R. 20). The ALJ concluded by finding that Plaintiff was not under a disability. (R. 20).

## VI. Issues

The court concludes that Plaintiff has essentially raised three issues. The issues are as follows:

(1) Whether the ALJ improperly failed to recontact a treating physician.

(2) Whether the ALJ failed to give appropriate weight to Dr. Neeley's opinions.

(3) Whether the ALJ improperly substituted her opinion in place of medical evidence.

**Issue 1: Whether the ALJ improperly failed to recontact a treating physician.**

Plaintiff's first allegation is that ALJ Gavin committed error when she failed to recontact one of Plaintiff's physicians, Dr. Neeley, who had apparently been treating Plaintiff at Impact Christian Health Center. Found at 20 C.F.R. § 404.1512(e), the pertinent regulation explains that:

> When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will . . . first

>recontact your treating physician or psychologist or other medical source
>to determine whether the additional information we need is readily
>available. We will seek additional evidence or clarification from your
>medical source when the report from your medical source contains a
>conflict or ambiguity that must be resolved, the report does not contain
>all the necessary information, or does not appear to be based on
>medically acceptable clinical and laboratory diagnostic techniques.

20 C.F.R. § 404.1512(e).

In this instance, Dr. Neeley had opined that Plaintiff's physical impairment was musculoskeletal in nature; that her main physical problem was with repetitive fine motor movements; that, in addition to her physical impairment, she also had a mental impairment; that she had engaged in drug use which exacerbated her mental problems, but that even if her drug abuse was eliminated, she would still be unable to stay focused on simple repetitive tasks for an eight-hour workday. (R. 410-11).

In rejecting the opinion of Dr. Neeley, the ALJ provided as follows:

>As for the opinion evidence, Dr. Neeley had a telephone conversation
>with the claimant's attorney in which she gave her opinion of the
>claimant's limitations and capabilities. According to Dr. Neeley the
>claimant would find it difficult to perform simple repetitive movements
>because of discoordination and lack of good focal ability. Dr. Neeley
>also stated that in her opinion the claimant's mental problems would not
>go away if she did not use drugs. She went on to state that in her opinion
>the claimant would not be able to perform simple repetitive tasks for a
>normal eight hour work day because of chronic pain and medication side
>effects (Exhibit 16F).
>
>Although Dr. Neeley is a treating physician, the undersigned has not
>given significant weight to her assessment of the claimant's capabilities.
>In that regard, the undersigned notes that the radiographs of the
>claimant's cervical and lumbosacral spine, discussed above, do not
>support the limitations found by Dr. Neeley. In addition[,] the normal
>EMG and nerve conduction studies performed on the claimant in August

> 2005 also do not support Dr. Neeley's findings of extreme pain (Exhibit 13F). In addition, the neurologist Dr. Lorenzo-Bueltel did not find the significant limitations indicated by Dr. Neeley. Since Dr. Neeley's report is inconsistent with the objective evidence of record and is not supported by the examination made by the specialist, the undersigned has not given significant weight to Dr. Neeley's assessment.

(R. 20).

Based on the evidence of record, there was no need to recontact Dr. Neeley. There was no "conflict or ambiguity that must be resolved." Dr. Neeley provided a medical opinion that the ALJ concluded was inconsistent with other medical evidence in the record. The ALJ, therefore, rejected Dr. Neeley's opinions. This was well within the ALJ's power to do. Consequently, the ALJ's failure to recontact Dr. Neeley was not in error.

**Issue 2: Whether the ALJ failed to give appropriate weight to Dr. Neeley's opinions.**

Plaintiff also argues that the ALJ should have given greater weight to the opinions of Dr. Neeley. Opinions of a treating physician are generally entitled to controlling weight. *Clifford v. Apfel,* 227 F.3d at 870. However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001).

While there is some evidence in the record that supports Dr. Neeley's characterization of Plaintiff's fine finger manipulation and upper extremity limitations, there is ample conflicting evidence that supports the ALJ's decision concluding that Dr.

Neeley's opinions were not entitled to controlling weight. As Plaintiff notes, Dr. Galen did record poor grip strength; however, muscle strength and reflexes in Plaintiff's upper extremities were not affected, and Dr. Galen opined that Plaintiff would benefit from physical therapy.[1] (R. 294). And, from January to March 2005, Plaintiff missed at least 14 physical therapy sessions, a theme that has been common throughout the history of Plaintiff's treatment. (R. 305-13). Additionally, as Dr. Lorenzo-Bueltel indicated, an August 2005 EMG and nerve conduction studies of Plaintiff's upper extremities were completely normal. (R. 383). Dr. Roberts also noted his opinion that the weakness in Plaintiff's upper extremities may be effort dependent, and that he was unable to document any evidence that substantiated Plaintiff's claim that she was experiencing numbness in her left fingers. (R. 408). Finally, Dr. Roberts indicated that when Plaintiff underwent cervical epidural steroid injections, she obtained a tremendous amount of relief. (R. 403). Because Dr. Neeley's opinions appear to be inconsistent with other evidence in the medical record and are perhaps even based on Plaintiff's exaggerated complaints as evidenced by the opinions of Dr. Roberts, we conclude that the ALJ was not in error when she declined to give controlling weight to Dr. Neeley's opinions.

**Issue 3: Whether the ALJ improperly substituted her opinion in place of medical evidence.**

Finally, Plaintiff claims that the ALJ erred by substituting her own opinion about

---

[1] Plaintiff alleges that the ALJ erred by failing to discuss Dr. Galen's records. However, an ALJ need not include every single piece of medical evidence in her opinion, so long as she does not completely exclude a particular line of evidence.

Plaintiff's mental condition in place of medical evidence.  ALJ Gavin examined the "B criteria" of Listings 12.04 and 12.08 and concluded that, when Plaintiff's substance abuse was not taken into consideration, Plaintiff had mild restrictions of activities of daily living, mild difficulty maintaining social functioning, mild difficulties maintaining concentration, persistence, and pace, and no episodes of decompensation.  (R. 18).  Based on these findings, the ALJ concluded that Plaintiff's mental impairments were not severe. These findings were completely consistent with the findings of state agency physician Dr. Shipley who found similar results for the "B criteria" of these Listings.  Additionally, the following medical findings are informative:  (1) Dr. Neeley opined that Plaintiff's drug use exacerbated her mental problems (R. 410); (2) Ms. Brizius opined that Plaintiff had an alcohol problem that affected her depression (R. 346-47); (3) Southwestern Indiana Mental Health Center reported that Plaintiff's mental problems will decrease with therapy but that Plaintiff will then discontinue therapy and her impairments will return (R. 339); and (4) Ms. Brizius reported that Plaintiff attended therapy until she received disability benefits and then no longer scheduled appointments.  (R. 396).

     Since there were no evaluations of Plaintiff in the record that listed more severe limitations with regard to the "B criteria" of Listings 12.04 and 12.08 than Dr. Shipley and the ALJ provided, and because there were at least two instances from Ms. Brizius and Dr. Neeley that suggested that Plaintiff's substance abuse contributed to her mental impairments, the ALJ's findings concerning the "B criteria" of these Listings was supported by substantial evidence and was not in error.

## VII.  Conclusion

There was no need for the ALJ to recontact Dr. Neeley.  And, Dr. Neeley's opinions were inconsistent with other medical evidence in the record and not entitled to controlling weight.  Finally, the ALJ's decision concerning the "B criteria" of Listings 12.04 and 12.08 was not in error.  The final decision of the Commissioner is, therefore, **AFFIRMED**.

**SO ORDERED** this 26th day of March 2008.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

J. Michael Woods
WOODS & WOODS
mwoods@woodslawyers.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov